Filed 7/22/15 Buckley v. Advanced Critical Care L.A., Inc. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| TRISTRAM BUCKLEY, | B253367 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC479514) |
| ADVANCED CRITICAL CARE LOS ANGELES, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County. Steven J. Kleifield, Judge. Affirmed.

Tristram Buckley & Associates and Tristram Buckley for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez, Timothy R. Windham, and Shauna Fraser for Defendants and Respondents.

Tristram Buckley (appellant) appeals from an order sustaining a demurrer to the second cause of action in appellant's third amended complaint (TAC). The second cause of action alleged a class action against City of Angels Veterinary Specialty Center, LLC; Advanced Critical Care & Internal Medicine, Inc.; Advanced Critical Care Los Angeles, Inc. (ACCLA); Richard Mills, DVM (Dr. Mills); and Siobhan O'Neill, DVM (Dr. O'Neill) (collectively respondents) under the Consumer Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.)[1] Appellant contends that the trial court erred in sustaining the demurrer without leave to amend because respondents' conduct falls within the CLRA's definition of unlawful conduct and the allegations satisfy the common question requirements for proceeding as a class action. We affirm the decision of the trial court.[2]

**FACTUAL BACKGROUND**

In 2011, appellant's 17-year-old Pekingese dog, Shelby, began exhibiting symptoms of illness. She was experiencing lethargy, vomiting, diarrhea, and lack of appetite. On August 8, 2011, appellant brought Shelby to Dr. Schwartz at the Overland Veterinary Clinic in West Los Angeles. Dr. Schwartz believed that Shelby had pancreatitis and referred appellant to respondent ACCLA. ACCLA was a 24-hour facility which was better equipped to give Shelby the care she needed, such as parenteral feeding.

Dr. O'Neill was an employee of ACCLA. Dr. Schwartz had already spoken with Dr. O'Neill at the time that appellant arrived at ACCLA. After Shelby was taken from him for treatment, appellant sat in the waiting room where he researched respondents and

---

[1] City of Angels Veterinary Specialty Center, LLC and Advanced Critical Care & Internal Medicine, Inc. are not parties to this appeal.

[2] The court's order is appealable under the death knell doctrine. Under this doctrine, an order may be appealable when the legal effect of the order "is tantamount to a dismissal of the action as to all members of the class other than plaintiff. [Citations.]" (*Daar v. Yellow Cab. Co.* (1967) 67 Cal.2d 695, 699.) An order sustaining a demurrer to class action allegations without leave to amend "is appealable to the extent that it prevents further proceedings as a class action. [Citation.]" (*Wilner v. Sunset Life Ins. Co.* (2000) 78 Cal.App.4th 952, 957, fn. 1.)

visited their website using Google. He alleges that what he read helped sway him into retaining respondents' services: "City of Angels Veterinary Specialty Center is comprised of six veterinary specialty practices under one roof. This group of veterinary specialists and their teams of highly trained care providers have chosen to operate from one location to offer the most efficient and effective medical care possible." Appellant further read:

> "**Supporting local veterinarians with complex cases.**
> "The majority of patients seen at City of Angels Veterinary Specialty Center are referred by the primary care veterinarian. The individual practices at City of Angels act as an extension of the primary veterinarian's healthcare team and are here to assist with cases that require the intervention of specially trained doctors and caregivers, a specific diagnostic procedure or an overnight emergency when the primary care clinic may be closed.
>
> "After a patient comes to one of the individual practices at City of Angels, the primary care veterinarian is contacted and information is shared readily in order that they remain part of the treatment planning. All cases are sent back to the primary care veterinarian for follow up or when the medical expertise of the practices at City of Angels is no longer needed."

Appellant used Google to research what he believed to be Shelby's condition (pancreatitis) and learned that the condition can cause extreme abdominal pain, nausea, vomiting and diarrhea. Appellant felt that Dr. O'Neill was "unwilling to accept the pancreatitis diagnosis" because Shelby's pancreas was not very swollen.

Dr. O'Neill's assistant returned with an estimate of $1,200 to $2,000 for 1.5 days of care. Appellant called other facilities to see if these rates were normal or extraordinary. Upon speaking with an animal hospital in Glendale, he learned that the same treatment there for two days was just $322.

Appellant raised the issue of the estimate by first asking why ACCLA was charging $145 for an examination. Dr. O'Neill informed appellant that she is a specialist and that is what a specialist's examination costs. When appellant asked Dr. O'Neill why

her facility was charging over $1,000 per day when other facilities charged just $330 for two days he was told that this was a facility of specialists and "you get what you pay for."

Appellant alleges that he later discovered that Dr. O'Neill was not a specialist, had just finished her residency, and did not have a permanent license to practice in California as she had only a temporary license. However this information was concealed from appellant. Appellant did not think it wise to remove Shelby from the facility, and since he wanted the best for her, he agreed to spend the higher amount of money for her care.

At all times appellant believed that Dr. O'Neill was a board certified specialist in internal medicine. This belief was based on respondents' sales and marketing information as well as representations from Dr. O'Neill. Appellant alleges that these representations were intentionally false and misleading.

Appellant alleges that Dr. O'Neill at all times was working under the supervision of Dr. Mills.

Rather than focusing on Shelby's condition, Dr. O'Neill became concerned about a growth on Shelby's stomach, for which Dr. O'Neill sought appellant's permission to perform a biopsy. Appellant gave his permission. When appellant later learned that Shelby had not been given the nutritional support she needed, he angrily complained: "You are starving my dog to death!" Shelby began receiving nutritional support and care from respondents three days after being brought to their facility. At that time Shelby weighed less than she did when she first came to respondents for care.

Shelby was released weighing 15 percent less than her normal body weight. Appellant had pages of instructions regarding medications and how to feed Shelby through a tube. Appellant followed the instructions he was given, but Shelby died the following day.

Appellant alleges that had Dr. O'Neill been honest, and not misrepresented her qualifications, appellant would never have entrusted respondents with Shelby. Appellant later discovered there were other complaints against these respondents for incompetence and false representations of specialist expertise. Appellant discovered that the average

4

experience level of the medical staff at ACCLA was low, and that most of the veterinarians were young and had just finished their residencies.

Appellant further alleges that Dr. Mills sponsored Dr. O'Neill's temporary license, and knew that Dr. O'Neill was not board certified in internal medicine. Appellant alleges that Dr. Mills knew that Dr. O'Neill did not possess the skills, knowledge, experience, prudence and diligence ordinarily possessed and exercised by specialist veterinarians.

## PROCEDURAL HISTORY

On February 23, 2012, appellant commenced this action against ACCLA, Dr. O'Neill, and Dr. Mills for violations of the CLRA, fraud and deceit, breach of contract, and veterinary malpractice. After successive demurrers and motions to strike, on June 11, 2013, appellant filed the TAC.

At issue in this appeal is the second cause of action in the TAC, alleged as a class action for violations of the CLRA. Appellant alleges that there is an ascertainable class, believed to be in excess of 200 people, who have been harmed by respondents' practice of falsely representing "the services they are providing and the expertise of their service providers, thereby violating the CLRA," and "charging rates substantially greater than regularly charged by even more experienced providers." Appellant alleges that the class members can be ascertained from the respondents' books and records. Appellant further alleges:

> "The members of the readily ascertainable class include consumers who were victims of the [respondents'] unfair methods of competition and unfair and deceptive acts and practices, as defined and set forth in Section 1770 of the CLRA in the Civil Code, by the [respondents'] representations, set forth herein, that their services had sponsorship, approval and characteristics which they did not have and representations that the [respondents] themselves had approval, status and affiliations which they did not have, and the [respondents'] false representations of services to be of a particular standard and quality when in fact they were not of that represented standard or quality but were in fact of a distinctly lesser standard and quality."

5

Appellant alleges that the "questions of law and fact common to the class are substantially similar and predominate over the questions affecting the individual members, specifically the false representations made by the [respondents] concerning their specialist services and the fees charged commensurate with specialist services . . . which were not provided as advertised and represented by these [respondents]."

On November 4, 2013, the trial court heard respondents' demurrer to the TAC. The trial court sustained respondents' demurrer to the second cause of action without leave to amend. The trial court held:

> "Plaintiff's allegations do not meet the elements of Civil Code section 1781(b).[3] In particular, the questions of law or fact common to the class are not substantially similar and predominate over questions affecting individual members and the claims or defenses of the representative plaintiff are not typical of the claims or defenses of the class. Each class member would be required to make individualized showings regarding the care their animal received, the misrepresentations made to them, their reliance on those misrepresentations, and the damages suffered. Further, if the issues of materiality or reliance are matters that would vary from consumer to consumer, the issue is not subject to common proof, and the action is not proper as a class action. . . . The representations made and reliance would vary from consumer to consumer."

On December 20, 2013, appellant filed his notice of appeal from the trial court's orders sustaining the demurrer to the second cause of action without leave to amend and dismissing the CLRA class action.

---

[3] Civil Code section 1781, subdivision (b), provides that the court shall permit a suit to be maintained on behalf of all members of the represented class if all of the following conditions exist: "(1) It is impracticable to bring all members of the class before the court. [¶] (2) The questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members. [¶] (3) The claims or defenses of the representative plaintiffs are typical of the claims or defenses of the class. [¶] (4) The representative plaintiffs will fairly and adequately protect the interests of the class."

## DISCUSSION

### I. Standard of review

"'On review from an order sustaining a demurrer, "we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory, such facts being assumed true for this purpose. [Citations.]" [Citation.] We may also consider matters that have been judicially noticed. [Citations.]' [Citation.] '"[W]hen the allegations of the complaint contradict or are inconsistent with such facts, we accept the latter and reject the former. [Citations.]" [Citation.] We give the same precedence to facts evident from exhibits attached to the pleading. [Citations.]' [Citation.]" (*Tucker v. Pacific Bell Mobile Services* (2012) 208 Cal.App.4th 201, 210 (*Tucker*).)

"If a demurrer is sustained, we exercise our independent judgment on whether a cause of action has been stated as a matter of law, regardless of reasons stated by the trial court. [Citation.] We affirm if the trial court's decision was correct on any theory. [Citation.]" (*Tucker, supra*, 208 Cal.App.4th at pp. 210-211.)

Trial courts are permitted to decide the issue of class certification on demurrer. (*Tucker, supra*, 208 Cal.App.4th at p. 212.) A trial court may sustain a demurrer to class action allegations where "'it concludes as a matter of law that, assuming the truth of the factual allegations in the complaint, there is no reasonable possibility that the requirements for class certification will be satisfied. [Citations.]' [Citations.]" (*Id.* at p. 211.)

"When a demurrer is sustained without leave to amend, 'we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citation.] Leave to amend should not be granted where amendment would be futile. [Citation.]" (*Tucker, supra*, 208 Cal.App.4th at p. 211.)

"'The plaintiff "bears the burden of demonstrating that the trial court erroneously sustained the demurrer as a matter of law" and "must show the complaint alleges facts

7

sufficient to establish every element of [the] cause of action." [Citation.]' [Citation.]" (*Tucker, supra*, 208 Cal.App.4th at p. 211.)

## II. Requirements for class certification under the CLRA

Civil Code section 1781, subdivision (b), establishes the criteria for class certification for suits brought under the CLRA. (Civ. Code, § 1781, subd. (b); *Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 654 (*Caro*).) One requirement of this provision is that "[t]he questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members." (Civ. Code, § 1781, subd. (b)(2).)

The predominance factor thus requires a showing that questions of law or fact common to the class predominate over individual inquiries. "To determine whether the questions of fact and law at issue in the litigation are common or individual, it is necessary to consider the individual causes of action pleaded, and the issues raised thereby." (*In re Vioxx Class Cases* (2009) 180 Cal.App.4th 116, 128 (*Vioxx*).)

The CLRA declares unlawful numerous practices in the sale of goods or services to consumers. (Civ. Code, § 1770, subd. (a).) Among the practices deemed unlawful is "[r]epresenting that goods . . . are of a particular standard, quality, or grade . . . if they are of another." (Civ. Code, § 1770, subd. (a)(7).) Appellant argues, among other things, that respondents represented to appellant and the consumer class that they were providing the services of veterinary "specialists," that is, services of a particular standard, grade and quality. On the contrary, appellant argues, respondents provided inexperienced veterinarians who had just finished their residencies, were working with temporary licenses and were not board certified specialists. For the purposes of this appeal, we assume the truth of these allegations and thus assume that respondents were engaging in unlawful conduct under the CLRA.

Significantly, however, the CLRA only allows recovery if the consumer "suffers damage as a result of" the unlawful practice. (Civ. Code, § 1780, subd. (a).) "This provision 'requires that plaintiffs in a CLRA action show not only that a defendant's conduct was deceptive but that the deception caused them harm.' [Citation.]" (*Vioxx,*

*supra*, 180 Cal.App.4th 116, 129.)  "Causation, on a classwide basis, may be established by *materiality*. . . .  [A] representation is considered material if it induced the consumer to alter his position to his detriment.  [Citation.]"  (*Ibid.*)  "In contrast, however, if the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action.  [Citation.]"  (*Ibid.*)

## III.  The demurrer to appellant's class action allegations under the CLRA was properly sustained

The trial court determined that appellant's CLRA class action allegations did not meet the requirements of Civil Code section 1781, subdivision (b).  In particular, it found that the questions of law or fact common to the class are not substantially similar and do not predominate over individual inquiries.  We find that the facts and the law support the trial court's decision.

Appellant may satisfy his burden of showing causation under the CLRA by showing materiality.  (*Vioxx, supra*, 180 Cal.App.4th at p. 129.)  A representation is considered material if it "induced the consumer to alter his position to his detriment." (*Ibid.*)  In contrast, if the issue of materiality or reliance is a matter that would vary from consumer to consumer, the action is not properly certified as a class action.  (*Ibid.*)

We find that in this case, the class members' claims would vary, requiring individual inquiry into each pet owner's reliance on respondents' alleged misrepresentations.  Appellant's own story is instructive.  Appellant brought Shelby to respondents on the recommendation of his veterinarian.  At the time that he arrived at respondents' care facility, his regular veterinarian had already spoken with Dr. O'Neill regarding Shelby's condition.  It was not until after Shelby was under the care of Dr. O'Neill that appellant perused respondents' alleged false representations of expertise.[4]  In addition, after he reviewed the representations, appellant considered taking

---

[4]      In his opening brief to this court, appellant asserts that he perused respondents' website prior to taking Shelby to respondents' facility.  This assertion is not supported by

Shelby elsewhere in order to obtain more favorable pricing. According to appellant, he declined to do so because he wanted the best possible care for Shelby and he "didn't think it wise to take her from Culver City to Glendale in Los Angeles' rush hour traffic."

These allegations create a factual question as to whether respondents' alleged false representations were, in fact, material to appellant's decision to use respondents' services for Shelby's care. Under the facts as alleged, appellant took Shelby to respondents because of his veterinarian's recommendation, not because of their advertised specialties. When appellant was taken aback by respondents' pricing, he chose to leave Shelby with respondents based on logistical factors and her delicate state of health, rather than solely on respondents' claims of expertise.

---

a citation to the record, therefore we need not consider it. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239.)

At oral argument, appellant again asserted that his allegations were that he perused ACCLA's website prior to bringing Shelby there. This is not what the TAC alleges. The relevant allegations of the TAC are as follows:

"53. Dr. Schwartz stated there was a facility, called 'Advanced Critical Care.' He stated they were a 24 hour facility specializing in emergency and critical care.

"[¶] . . . [¶]

"55. Dr. Schwartz noted Advanced Critical Care . . . was a 24 hour specialist facility and thus better equipped to give Shelby the supportive care she needed. He then stated there was another facility that also provided 24 hour care.

"56. All else apparently being equal, [appellant] chose the closer of the two facilities, ACC.

"57. Dr Schwartz then made an appointment for [appellant] to take Shelby from his facility to ACC at 1:00 p.m. that same Monday afternoon."

"[¶] . . .[¶]

"59. Dr. Schwartz had already spoken with . . . Dr. O'Neill, explaining Shelby's condition and his diagnosis. . . .

"[¶] . . .[¶]

"63. After signing the forms, [appellant] was taken to a waiting room. Shelby was then taken from [appellant] as he waited in the cold patient examining room.

"64. During this time, [appellant] Googled the [respondents] and visited their website."

10

Thus, based on appellant's allegations, it is not accurate to say that respondents' alleged false representations were universally material. Each individual consumer bringing his or her pet to respondents' facility would have a different story as to why that consumer ended up there. In addition to respondents' advertising, such reasons could include convenience of the location, referrals, condition of the pet, or the type of services needed. Because the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action. (*Vioxx, supra*, 180 Cal.App.4th at p. 129.)

Appellant does not directly address this issue in his briefs to this Court. Instead, he makes conclusory statements regarding the materiality of the representations. For example, he states: "the representations relied on were key and material, in fact, the very basis for selecting the [r]espondents' services." Appellant's unsupported conclusion that the statements made by respondents as to their expertise provided the basis for each class member's selection of respondents' facility is insufficient. This is particularly true where, as here, appellant's own decision to use respondents' services was based on several different factors.

Appellant argues that a subset of the class is all consumers who used respondents' services where the respondents represented the consumer was receiving the services of a specialist and the respondents billed the consumer for specialist services, yet the treating veterinarian was not a specialist. Again, we find that a determination of the representations relied upon by those consumers would require individual inquiries into the specific facts of each consumer's experience and a determination of how much each consumer relied upon the veterinarian's claim of expertise before agreeing to pay the high price for services. Again, appellant provides a good example. By the time he realized that respondents' prices were higher than other veterinarians, he thought it was too late in the day to drive to another veterinarian through heavy traffic. He chose to pay the higher prices rather than risk his pet's health. Other consumers may have had various reasons for agreeing to the higher prices, including the condition of their pet and recommendations from others as to the quality of services that respondents provided.

The *Vioxx* case is instructive.  Consumers brought a class action under the CLRA against the manufacturers of a pain relief drug, alleging that they were misled into thinking that the drug was safer than generic pain relievers when it was actually less safe and no more effective.  The trial court found that the decision to use the drug was an individual decision made by each physician in reliance on many different factors which varied from patient to patient, thus the issue of reliance or materiality could not be resolved on a classwide basis.  The Second Appellate District affirmed this decision, noting that the plaintiffs' focus on the manufacturer's alleged misrepresentations was a "vast oversimplification of the matter."  (*Vioxx, supra*, 180 Cal.App.4th at p. 133.)  Among other things, the Court of Appeal noted that "all physicians are different and obtain their information about prescriptions from myriad sources."  (*Id.* at p. 134.)  Furthermore, "physicians consider many patient-specific factors in determining which drug to prescribe, including the patient's history and drug allergies, the condition being treated, and the potential for adverse reactions with the patient's other medications -- in addition to the risks and benefits associated with the drug.  When all of these patient-specific factors are a part of the prescribing decision, the materiality of any statements made by Merck to any particular prescribing decision cannot be presumed."  (*Ibid.*, fn. omitted.)

Similarly, here, consumers obtain their information about veterinarians from different sources.  Some may receive referrals from other veterinarians or friends; others may read online reviews.  Some may chose a veterinarian that is close to their home or workplace.  In addition, pet-specific factors may be considered, such as the types of services a certain veterinarian provides or whether the animal is familiar with the veterinarian or location.  Under the circumstances, the materiality of the statements made by respondents regarding their specialist services cannot be presumed.

In *Brown v. Regents of the University of California* (1984) 151 Cal.App.3d 982 (*Brown*), the Court of Appeal reached a similar conclusion regarding plaintiffs' allegations of factual concealment and misrepresentation regarding the level of coronary care provided at the University of California, Davis, Medical Center (Medical Center)

12

and the Medical Center's failure to provide adequate coronary care. (*Id.* at p. 986.) Among other things, plaintiffs contended that the defendants made oral and written misrepresentations regarding the "quality of the coronary care received at the Medical Center: that the most modern equipment was used, that patients benefit from the most advanced surgical techniques and equipment available, that patients are provided specially trained physicians and staff, that the hospital stay is made as comfortable and short as possible, and that appropriate referrals are made as needed." (*Id.* at p. 987.) Plaintiffs alleged that such representations were false.

The Court of Appeal found that individual issues substantially predominated over common questions. While agreeing that the fact that certain representations were made, and proof of the falsity of these statements would be common to all members of the class, the court found that the common questions ended there:

> "Beyond these elements, however, we encounter a veritable quagmire of tough factual questions which can only be resolved by individual proof. Whether a particular class member relied upon the representation, for example, will require close scrutiny of what was said between a class member and his physician. A class member's particular medical condition and method of treatment must be examined in order to determine proximate cause of any claimed damage and the actual extent of such damage. All of the foregoing involve questions of what is medically appropriate for a particular patient under his particular circumstances. Viewed in this context, the complaint raises numerous and substantial individual questions of fact such that it is not reasonably possible plaintiffs will be able to establish a sufficient community of interest to warrant class action."

(*Brown, supra*, 151 Cal.App.3d at p. 989.)

Several other cases have agreed that where, as here, proof of reliance will involve individual inquiries, a class action is inappropriate. (See, e.g., *Tucker, supra*, 208 Cal.App.4th 201 [misrepresentations regarding rounding up minutes of use inappropriate for class action because misrepresentations were communicated through various means and class members' awareness would necessarily involve individualized inquiries]; *Caro, supra*, 18 Cal.App.4th 644 [class action inappropriate for claims of misrepresentations in

13

orange juice packaging because consumers may not have looked at the packaging and may not have been induced to purchase by the representations on the packaging]; *Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830 [class action complaint alleging improper and deceptive sales practices in sale of whole life insurance policy inappropriate for class action because sales agents were free to use different methods and materials in their sales presentations and consumers may not have received and relied upon the same information]; *Cohen v. DIRECTV, Inc.* (2009) 178 Cal.App.4th 966 [class action complaint alleging that company had disseminated false advertising to induce purchase of high definition services inappropriate for class certification because the class would include subscribers who saw differently-worded advertisements and others who may have relied on word of mouth rather than advertisements].)

Appellant cites a federal case, *Chavez v. Blue Sky Natural Bev. Co.* (N.D.Cal. 2010) 268 F.R.D. 365 (*Chavez*) for the proposition that "reliance on the alleged misrepresentations may be inferred as to the entire class if the named plaintiff can show that material misrepresentations were made to class members. [Citation.]" (*Id.* at p. 376.) The *Chavez* court did not provide a thorough analysis of why the representations at issue were material, therefore we decline to find that the case supports appellant's position in this matter. In its cursory discussion, the *Chavez* court relied heavily on *Steroid Hormone Product Cases* (2010) 181 Cal.App.4th 145 (*Steroid*). *Steroid* involved the over-the-counter sale of products containing anabolic steroids, which are controlled substances under California law. In discussing the viability of the plaintiffs' CLRA class action claim, the *Steroid* court noted, "The CLRA claim requires a different analysis than the UCL claim, because the CLRA requires a showing of actual injury as to each class member." (*Id.* at p. 155.) The court emphasized that "both the named plaintiff and unnamed class members must have suffered some damage caused by a practice deemed unlawful under Civil Code section 1770." (*Steroid*, at p. 156.) In determining that the named plaintiff had successfully made such a showing, the *Steroid* court stated: "[T]he question that must be answered in this case is whether a reasonable person would find it important when determining whether to purchase a product that it is unlawful to sell or

14

possess that product.  It requires no stretch to conclude that the proper answer is 'yes' --
we assume that a reasonable person would not knowingly commit a criminal act.
[Citations.]" (*Id.* at p. 157.)

In the present matter, the materiality question is far more complex.  As discussed
in detail above, numerous significant factual questions go into an individual's decision
regarding appropriate medical care for his or her pet.  There are far too many pet-specific
and owner-specific reasons that individual consumers may have chosen to utilize
respondents' services to make a generalized finding regarding the materiality of
respondents' claims of specialization.

Based on the facts and the law discussed above, we find that appellant's
allegations do not meet the requirements of Civil Code section 1781, subdivision (b).
Questions of fact on the issue of reliance are not substantially similar.  Instead, individual
inquiries on this issue will predominate.  Thus, a class action is inappropriate and
respondents' demurrer to the class action cause of action was properly sustained.

### DISPOSITION

The order is affirmed.  Respondents are awarded their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT

15